## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

-------------------------------------------------------------X

DR. BRIAN G. WALKER,                 :           Civil Action No.

                     :

            Plaintiff,        :

                     :

                     :           **COMPLAINT**

        -against-            :

                     :

                     :

                     :

FAIRFIELD UNIVERSITY,           :

                     :

           Defendant.      :

-------------------------------------------------------------X

Plaintiff, Dr. Brian G. Walker (hereinafter referred to as "Plaintiff" or "Dr. Walker"), by his attorneys, Nesenoff & Miltenberg, LLP, alleges upon knowledge with respect to himself, and upon knowledge, information and belief as to all other matters, as follows:

### INTRODUCTION

1.      This action arises out of Defendant Fairfield University's ("Defendant Fairfield's" or the "University's") blatant stereotyping of Dr. Walker as a predator and sexual deviant based solely on Dr. Walker's identity as homosexual. This action further arises out of Defendant Fairfield's blatant disregard for, and refusal to investigate, Dr. Walker's complaints of discrimination in utter violation of the University's multiple policies and procedures.

2.      Dr. Walker has been employed as a faculty member at Defendant Fairfield's Jesuit institution since 2006. Over the course of his tenure with the University, Dr. Walker has proven himself to be a loyal and resolute educator. He has helped to mentor and foster the minds of students pursuing careers in the field of science for close to two decades.

3.      During his employment with Defendant Fairfield, Dr. Walker has participated in several international research studies and often permitted students to accompany him on his travels to assist in research and data collection. One such opportunity arose in the Fall of 2021 when Dr. Walker planned a trip to Argentina to continue his research with wild penguins.

4.       When Dr. Walker advocated for his then research assistant, a male student at the University, to accompany him on the trip, at the student's request, Dr. Walker's pleas were steadfastly rejected by the University based on a specious claim of "risk." It was not until the student himself confronted Defendant Fairfield's administration did the true justification for the denial come to light.

5.      Indeed, during a discussion with the University's Provost, the administration admitted that the reason for the denial was due to the University's assessment that the student's safety would be at risk in travelling with Dr. Walker due to, in the University's mind, the potential risk of Dr. Walker to commit sexual abuse against the student. The University's Provost attempted to use an example from decades prior wherein a former student of Defendant Fairfield, along with a former employee of Defendant Fairfield, travelled alone together to Haiti, during which time the employee abused the student. Subsequently, the student went on and used his respective position of power to sexually abuse disadvantaged and impoverished youth in Haiti during a University funded charitable project known as "The Haiti Project."  The University Provost then stated that, "on the surface" what happened then "looks exactly the same" as what was being asked here.

6.      The University's basis for denying the student and Dr. Walker the opportunity to work together to complete research that had already been started years prior was utterly abhorrent and wholly unjustified.

7.      Adding insult to injury, when Dr. Walker attempted to report the Provost's discriminatory and defamatory statements to the proper authorities at Defendant Fairfield, the

University refused to investigate the incident in violation of the University's own policies and, instead, chose to subject Dr. Walker to the proverbial "run around", all while he was forced to work alongside the same administration who branded him a sexual deviant to his own student.

8.      Accordingly, Plaintiff brings this action for damages against Defendant Fairfield for employment discrimination in violation of Title VII of the Civil Rights Act of 1964, the Connecticut Fair Employment Practices Act, and Title IX of the Education Amendments of 1974, together with any and all causes of action which may be reasonably inferred from the facts as alleged herein.

## THE PARTIES

9.      At all times relevant to this Complaint, Plaintiff was and is a natural person and a resident of the State of Connecticut.

10.     Plaintiff identifies as homosexual.

11.     Fairfield University ("Defendant Fairfield" or the "University") was at all times relevant, and continues to be, a private Jesuit university located at 1073 N. Benson Road, Fairfield, Connecticut 06824.

12.     At all times mentioned herein, Defendant Fairfield received, and continues to receive, federal financial assistance and funding in the form of, among other things, receipt of Federal Pell Grants.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

13.     This Court has jurisdiction over Plaintiff's claim(s) based on 28 U.S.C. §§ 1331 and 1332.

14.     Venue is proper in this case pursuant to 28 U.S.C. § 1391.

15.     Plaintiff has satisfied all conditions precedent to filing the instant Complaint.

16.     On or about August 18, 2023, Plaintiff filed a timely complaint with the Connecticut Commission on Human Rights and Opportunities (the "CHRO"), which was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC") alleging gender and sexual orientation discrimination.

17.     On or about December 16, 2024, the CHRO issued Plaintiff a Release of Jurisdiction over Plaintiff's agency complaint.

18.     Thereafter, on or about February 14, 2025, the EEOC issued Plaintiff a Dismissal and Notice of Rights to Sue.

19.     This action is being filed within 90 days of Plaintiff's receipt of the CHRO Release of Jurisdiction and within 90 days of Plaintiff's receipt of the EEOC Dismissal and Notice of Rights to Sue.

## OPERATIVE FACTS AND ALLEGATIONS

### I.     Plaintiff's Background and Employment at Defendant Fairfield

20.     Dr. Walker commenced employment with Defendant Fairfield in or around September 2006 as an Assistant Professor of Biology.

21.     In or around 2010, Dr. Walker received tenure and was promoted to Associate Professor.

22.     From approximately 2010 through 2014, Dr. Walker served as Chair of Defendant Fairfield's Department of Biology. Thereafter, from approximately 2014 through 2017, Dr. Walker served as an Associate Dean of Defendant Fairfield's College of Arts and Sciences.

23.     In or around 2017, Dr. Walker received another promotion to Full Professor. Dr. Walker continues to serve as a Full Professor of Biology at Defendant Fairfield.

24.     Throughout his tenure with Defendant Fairfield, Dr. Walker proved himself, and continues to prove himself, to be a dedicated, knowledgeable, and well-liked educator. Dr. Walker fostered positive relationships with his fellow educators as well as his students.

25.     Dr. Walker identifies as homosexual.

26.     Upon information and belief, Dr. Walker's sexual orientation was well known to Plaintiff's colleagues at the University, including those in Defendant Fairfield's administration.

27.     Prior to 2021, Dr. Walker's sexual orientation had never presented an issue for him at the University.

**II.     Dr. Walker Prepares to Take a Research Trip to Argentina with his <u>Research Assistant</u>**

28.     As a researcher, Dr. Walker specializes in examining how human activity affects the stress and health of wild animals, predominantly penguins.

29.     Due to the nature of Dr. Walker's research, his work often requires him to engage in international travel, as is customary in the field of conservation biology. Dr. Walker regularly engaged and included his students in his research endeavors, including, on very rare occasions, inviting his students to travel with him to conduct "in the field" research in international locations, such as Argentina.

30.     In or around September of 2020, Dr. Walker began to work with a Research Assistant who was also a student at the University, "Male Student X"[1].

31.     Male Student X remained Dr. Walker's Research Assistant through Male Student X's graduation from Defendant Fairfield in or around May 2022.

---

[1] For privacy reasons, Plaintiff identifies the student by pseudonym only. Plaintiff shall disclose the student's true name and identity subject to any Court order or pursuant to a protective order. Plaintiff notes that Defendant Fairfield is aware of the true identity of Male Student X and, therefore, use of a pseudonym in Plaintiff's pleading does not prejudice the University.

32.     Initially, as the COVID-19 pandemic spread across the world, Male Student X's work with Dr. Walker was focused predominantly in the lab.

33.     For nearly a year and a half, including summer research, Male Student X worked with Dr. Walker to develop protocols for the examination of microplastics in penguins, working exclusively with lab samples collected from penguins housed at Mystic Aquarium, in Connecticut, and the Central Park Zoo, in New York City.

34.     In or around August of 2021, as the COVID-19 pandemic was beginning to wane and international travel was resuming, Dr. Walker began to prepare for a research trip to return to Argentina.

35.     Notably, the travel to Argentina by Dr. Walker was for an approved sabbatical award granted to Dr. Walker for the Spring of 2021. However, due to COVID-19 and resulting travel restrictions, Dr. Walker was not permitted to engage in international travel during the Spring 2021 semester.

36.     As of August 2021, however, US restrictions for international travel began to relax and, with approval from the University, Dr. Walker initiated plans to spend the entire fall semester (starting September 2021 through and including the winter break) in Argentina.

37.     The research trip to Argentina was for the purpose of studying two colonies of wild penguins. Specifically, the data to be collected were to include the collection of fecal samples from Magellanic Penguins at two different colonies in Argentina, for the analysis of microplastic contamination.

38.     Dr. Walker had worked with one of the subject colonies in question in Argentina for the preceding twenty-five (25) years, first working there starting on or about September 1996. Dr.

Walker has spent more than 6 years of his life living in Argentina working with penguins, primarily at the Punta Tombo Magellanic Penguin colony, in Chubut, Argentina.

39.     Dr. Walker had never had any issue with injuries with those he worked with and/or supervised, including students and field technicians, nor any other performance concerns with any person for which he interacted with in his professional or personal activities while in Argentina.

40.     Dr. Walker and Male Student X discussed the student's desire to join Dr. Walker in Argentina in December of 2021, for a once-in-a-lifetime research experience.

41.     Male Student X shared Dr. Walker's enthusiasm and excitement to finally be able to use the tools and protocols they had developed in the lab on a wild colony in the field.

42.     In addition to the very rare opportunity for a hands-on experience with wild penguins in the field in Argentina for Male Student X, the research to be conducted in Argentina was expected to allow the acquisition of the remaining data to complete Dr. Walker's and Male Student X's senior research project, and for the ultimate publication of that research in a peer-reviewed scientific journal.

43.     Male Student X had applied for and obtained research grants and scholarships to completely cover the costs associated with his portion of the trip.

44.     Dr. Walker began to prepare for the research trip with the understanding that male Student X would join the study from December 2021 to January 2022.

45.     Unfortunately, by mid-August, 2021, while international travel was allowed for citizens to travel to foreign countries by the US government (with significant warnings depending upon location), Argentina had decided that citizens of the USA were NOT allowed to visit.  So, plans for both the sabbatical by Dr. Walker and the trip for Male Student X were put on hold.

46.     On September 28, 2021, Dr. Walker initiated an email conversation with the University's Provost, Christine Seigel ("Provost Seigel"), to attempt to address the second apparent lost semester of his sabbatical award.

47.     Sometime prior to October 11, 2021, Argentina decided to open their borders for citizens of the USA to visit, beginning on November 11th.

48.     On October 11th, Dr. Walker informed Provost Siegel of this change, informed her he intended to go to Argentina in November for the remainder of the semester, and requested what also needed to be done to get Male Student X's approval for travel to join him at the end of the semester.

49.     On October 15th, Provost Siegel warmly replied with her approval for Dr. Walker's travel to Argentina.

50.     In the same email on October 15, 2021, Provost Siegel also informed Dr. Walker that the University would not approve Male Student X to join in the trip to Argentina.

51.     Specifically, Provost Seigel stated,

> At this time, the University is approving University-sponsored student travel on a limited case by case basis in coordination with our long-standing study abroad sites and our student travel provider. At this time, the University is not supporting international travel for student research.

52.     International travel for Fairfield University undergraduates was not unilaterally denied for the Fall of 2021.

53.     Following Provost Siegel's email, Dr. Walker reached out to Jennifer Ewald, Defendant Fairfield's Director of Global Strategy ("Director Ewald"), to begin the process of appealing the decision to deny Male Student X's ability to travel and seek approval for Male Student X to join Dr. Walker on the research study.

54.     Dr. Walker's and Male Student's X appeal to Defendant Fairfield to permit Male Student X's travel to Argentina was supported by members of Dr. Walker's department, including Defendant Fairfield's Chair of Biology, Dr. Shelley Phelan.

55.     Still, Dr. Walker's advocacy to permit Male Student X to accompany him on the research trip was met with hesitancy by many within the University's administration, including Provost Seigel who only begrudgingly admitted that Male Student X and Dr. Walker should be permitted to argue their case for reconsideration of the University's initial determination.

56.     Over the course of Dr. Walker's advocacy on behalf of Male Student X's ability to participate in the Argentina research study, Defendant Fairfield's administration repeatedly cited the risk presented by the COVID-19 pandemic as a basis for rejecting Male Student X's application to travel for the research study.

57.     In response, Dr. Walker noted to Defendant Fairfield's administration that, compared to areas in Europe and within the United States where the University had already approved for student travel, Argentina presented a lesser risk of COVID-19 infection.

58.     In fact, Dr. Walker provided data which specifically supported the lesser degree of risk travelling to Argentina presented to students as compared to other areas where the University did not restrict student travel.

59.     Moreover, the nature of the research trip itself presented a lesser safety risk than the study abroad international travel the University had approved for students visiting other countries. By way of example, but not limitation, the nature of the research study—wherein Dr. Walker would be collaborating with Male Student X on a nearly full-time basis—permitted the near constant supervision of the student. In comparison, the study abroad programs approved by the University resulted in large

groups of students travelling abroad and living in situations with limited faculty/administrative supervision.

60.    On or about December 1, 2021, after Dr. Walker had already left for Argentina, Plaintiff was advised by Defendant Fairfield's Dean of the College of Arts and Sciences, Dr. Richard Greenwald ("Dean Greenwald"), that Plaintiff's application for Male Student X to join the research study in Argentina had been denied.

61.    Dean Greenwald also notified Male Student X via email of the decision to deny Student's travel to Argentina.

62.    Although the University's administration had repeatedly cited to an alleged increased risk to Male Student X due to the COVID-19 pandemic as the basis to prohibit his travel with Dr. Walker to Argentina, a point repeatedly refuted by Dr. Walker and which concerns easily could have been assuaged had the University been transparent with its concerns early in the process, Dean Greenwald notably did not cite this as the basis for the University's decision in his notice to Male Student X of the final determination.

63.    Instead, Dean Greenwald merely noted an "extraordinary risk" the travel allegedly posed as the reason for the University's prohibition on Male Student X's participation in the research study

### III.    Defendant Fairfield's Involvement in "The Haiti Project," an Initiative Which Resulted in the Sexual Victimization of Hundreds of Children

64.    In or around 1997, Douglas Perlitz ("Perlitz"), a 1992 graduate of Fairfield University, founded Project Pierre Toussaint ("PPT") in Cap Haitien, Haiti. Project Pierre Toussaint was a home and school for underprivileged Haitian boys.

65.     Defendant Fairfield, spearheaded by its then Director of Campus Ministry, Jesuit Fr. Paul Carrier ("Carrier") was a primary supporter of Perlitz and what would become known as "The Haiti Project."

66.     Defendant Fairfield set up a special fund, known as the Haiti Fund, to financially support The Haiti Project and which ultimately became the primary fundraising arm of The Haiti Project.

67.     Through the Haiti Fund, substantial donations were made to The Haiti Project and Perlitz.

68.     Defendant Fairfield very publicly supported Perlitz and The Haiti Project, going as far as to award Perlitz an honorary degree in recognition for his charitable work with the impoverished youth in Haiti.

69.     In addition, Carrier openly supported The Haiti Project and Perlitz, and was known to visit the school in Haiti on occasion.

70.     As it would turn out, The Haiti Project was not the safe haven for underprivileged boys in Haiti that it purported to be. Instead, the institution was used as a ruse by Perlitz to attract, entrap, and abuse the boys brought to its doors.

71.     In or around 2007, a number of Perlitz's victims, all former students of the Haiti Project, began to speak out against the abuses they suffered at Perlitz's hand. Specifically, Haitian journalist, Cyrus Sibert reported on Perlitz's sexual abuse of PPT's students, amplifying the victims' voices and spurring multi-national investigations into Perlitz and PPT.

72.     Throughout the course of such investigations, facts came to light implicating Carrier's participation in the abuse, as well as the misuse of the Haiti Fund proceeds by Perlitz, the implication

being that funds meant from Defendant Fairfield had been used by Perlitz to support his grooming practices and sexual abuse of the boys at PPT.

73.     Perlitz eventually pled guilty to the sexual abuse of boys in his care at PPT and is presently set to remain imprisoned until 2026.

74.     As a direct result of the scandal, Defendant Fairfield saw itself embroiled in decades long litigation with PPT victims who alleged that the University was, among other things, negligent in its supervision of The Haiti Project and agents under its direction, namely Carrier and Perlitz.

75.     The multiple litigations, settled only a few short years ago, resulted in the University, among other defendants, paying millions of dollars in settlements to Carrier's and Perlitz's victims.

## IV.    Defendant Fairfield Implies to Male Student X that Travelling with Plaintiff Presented a Risk of Exposure to Sexual Abuse

76.     After receiving notice of the University's decision to deny Male Student X's travel, Dr. Walker insisted that Provost Seigel and Dean Greenwald, out of respect to Male Student X, meet face to face with Male Student X to relay the decision not to permit his travel to Argentina and explain their reasoning.

77.     Dr. Walker's request for a face-to-face meeting was also supported by the Department Chair.

78.     On or about December 9, 2021, at Plaintiff's demand, Male Student X met with Dean Greenwald, who explained the reasons he was told for the denial of Male Student X's travel to Argentina relayed to him by the Provost.

79.     Also on or about December 9, 2021, and again at Plaintiff's demand, Male Student X also met with Provost Seigel to discuss the denial of his travel to Argentina[2].

---

[2] Male Student X recorded the discussion with Provost Seigel. The following statement, marked with quotations, are taken directly from the recording.

80.     Initially, Provost Seigel cited issues related to the COVID-19 pandemic as justification for the denial of Male Student X's travel. After Male Student X pushed back on these justifications, upon information and belief, Defendant Fairfield's true reasons for denying Male Student X's application for travel became known.

81.     Specifically, over the course of the conversation, Provost Seigel repeatedly mentioned the University's need to assess and mitigate "risk."

82.     In this context, Provost Seigel began to describe The Haiti Project. She noted that during The Haiti Project, "upwards of 100 disadvantaged children were sexually abused" and noted that the abuser, Perlitz, had himself been allegedly sexually abused by a University faculty member, Carrier, during his (Perlitz's) time as a student and during a time when Perlitz had travelled internationally with Carrier as part of a University project.

83.     Provost Seigel noted that the abuse was able to occur "because someone did [not] pay attention to the risk associated, did [not] do all the checks and balances" when Perlitz was Male Student X's age.

84.     Provost Seigel stated that due to the University's alleged lack of attention to the risk of sexual abuse when Perlitz was a student, Perlitz went on to himself be an offender and was then imprisoned.

85.     Confused by Provost Seigel's mention and speech about The Haiti Project, Male Student X tried to understand what Provost Seigel was implying. At that point, Provost Seigel likened Male Student X's travel with Dr. Walker as "exactly the same" as the situation with Perlitz.

86.     Provost Siegel also encouraged Male Student X to "do a Google search on the Haiti Project and Doug Perlitz" if he was curious and wanted to know more information about the whole situation.

87.    Provost Seigel also made reference that her decision and reasoning to deny Male Student X's application to travel was supported by Defendant Fairfield's Board of Trustees, who urged Provost Seigel to "have [her] eyes on the risk."

88.    Provost Seigel admitted to Male Student X that a homosexual male professor traveling alone with a male student presented a risk to that student of potentially being sexually abused.

89.    Provost Seigel's multiple statements were not only wildly inappropriate and defamatory, but they were also, upon information and belief, informed by archaic and biased stereotypes that members of the LGBTQIA+ community are, by their very nature, sexual deviants.

90.    In the University's assessment, and under advisement from the Board, Dr. Walker's status as a homosexual man automatically made him a potential sexual predator and, therefore, Defendant Fairfield had to 'protect' Male Student X or risk further liability akin to that shouldered by the University as a result of The Haiti Project.

## V.    Male Student X Informs Dr. Walker of the University's True Motives

91.    Following his meeting with Provost Seigel, Male Student X virtually met with Dr. Walker over ZOOM to inform Plaintiff of Provost Seigel's statements.

92.    Provost Seigel's statements, as described by Male Student X, were so outrageous that Dr. Walker did not believe Male Student X at first. It was not until Male Student X informed Dr Walker that the conversation had been audio recorded, and Dr. Walker listened to the recording, that Plaintiff was able to accept that Provost Seigel had made such heinous statements against him.

93.    After listening to the recording, Dr. Walker spoke to Male Student X about his sexual orientation, which Male Student X was already aware of, and assured Male Student X that nothing like what had happened during The Haiti Project would ever happen during travel with Dr. Walker.

94.    Male Student X informed Plaintiff that it was very obvious to him (Male Student X) that Provost Seigel "did not trust" Plaintiff.

95.    Indeed, even prior to the denial of male Student X's travel, while Dr. Walker was still in the planning phases of his trip, Dr. Walker insisted that Male Student X inform his parents that he (Plaintiff) was a homosexual to make sure that Male Student X and his family were absolutely comfortable with the two travelling together.

96.    Male Student X did not need these assurances as he already knew and trusted in Dr. Walker's integrity, as did Male Student X's family.

97.    Plaintiff insisted the conversation between Male Student X occur.

98.    Male Student X subsequently reported back to Plaintiff that the conversation had occurred and reiterated that all trusted Plaintiff's integrity.

99.    Following Male Student X's graduation in May of 2022[3], Plaintiff sought to formally address the discrimination he suffered at the University.

100.    Accordingly, Dr. Walker filed a complaint with Defendant Fairfield's Senior Director of Equity & Title IX Coordinator Megan Monahan ("Coordinator Monahan").

**VI.    Plaintiff Fights to Have His Complaint of Discrimination Taken Seriously by Defendant Fairfield**

**a.    Defendant Fairfield's Policies and Procedures Under the Employe Handbook**

101.    As of the time of Dr. Walker's complaint to Coordinator Monahan, Defendant Fairfield maintained an Employee Handbook which included, among other things, a policy and procedure for the investigation of complaints of discrimination under Title IX.

---

[3]Plaintiff chose to wait for Male Student X to graduate from the University before pursuing any action related to the Argentina trip and Provost Seigel's statements in deference to Male Student X's fear of retaliation by the University.

102.    Specifically, the University's Employee Handbook at Exhibit B defined "Sexual Harassment" as (a) unwelcome conduct (b) determined by a reasonable person (c) to be so severe (d) and pervasive (e) and objectively offensive (f) that it effectively denies a person equal access to the University's education program or activity.

103.    With respect to the definition of Sexual Harassment, the Employee Handbook provided that the element of "unwelcomeness" was "subjective and determined by the Complainant" whereas the elements of "severity, pervasiveness, and objective offensiveness" were to be evaluated "based on the totality of the circumstances from the perspective of a reasonable person … in the shoes of the Complainant".

104.    Pursuant to the Employee Handbook, complaints that allege Sexual Harassment, as defined, were pursued under the University's "Process A."

105.    Under Process A, the Title IX Coordinator is empowered, upon receipt of a complaint, to (i) offer supportive measures to a complainant, (ii) offer an informal resolution to the complaint, and/or (iii) initiate a Formal grievance Procedure including the formal investigation and adjudication of the complaint.

106.    The Title IX Coordinator is further tasked with performing an initial assessment of the complaint within one to five business days.

107.    In making the initial assessment, the Title IX Coordinator has the authority to, among other things,

    a.    "work[] with the Complainant to make sure [the complaint] is correctly completed;"

    b.    "reach[] out to the Complainant to offer supportive measures;"

    c.    "work[] with the Complainant to ensure they are aware of the right to have an Advisor."

108.    For complaints that are determined not to meet the definition of sexual harassment as provided for in the Employee Handbook, the Employee Handbook mandates that the complaint be dismissed, which dismissal is appealable.

109.    The Employee Handbook further provided a separate procedure for investigation of conduct that did not reach the level of sexual harassment, known as "Process B."

110.    Process B was supposed to be available to address complaints of, among other things,

   a.  Discriminatory Harassment Based on Sex including conduct that does not meet the definition of Sexual Harassment … but is unwelcome, sexual, sex-based and/or gender-based, verbal, written, online and/or physical conduct; and

   b.  Discrimination, defined as actions that deprive, limit, or deny other members of the community of educational or employment access, benefits, or opportunities, including disparate treatment; and

   c.  a violation of any other University policies … when [] motivated by actual or perceived sex and the result is a discriminatory limitation or denial of employment or educational access, benefits, or opportunities.

111.    Similarly to the procedure under Process A, under Process B, the Title IX Coordinator, or his/her designee, shall conduct an initial assessment including, but not limited to,

   a.  Reach[ing] out to the Complainant to offer supportive measures;

   b.  Work[ing] with the Complainant to ensure they have an advisor; and

   c.  Work[ing] with the Complainant to determine the complainant's preferred response to the complaint.

112.    Following the initial assessment, the University is mandated to initiate one of the following steps:

   a.  Supportive Response – measures to help restore the Complainant's education access;

   b.  Informal Resolution – typically used for less serious offenses and only when all parties agree, or when the respondent is willing to accept responsibility; or

    c.   Administrative resolution – a formal investigation of the policy violations leading to a conclusion and recommended finding, subject to appeal.

113.    Notably, the Employee Handbook did *not* empower the Title IX Coordinator, or anyone else at the University, to dismiss a complaint under Process B for failure to meet any standard or policy definition, as was permitted under Process A.

**b.  Defendant Fairfield Refuses to Investigate Dr. Walker's Complaint of Discrimination Under Either Process A or Process B**

114.    Plaintiff's Title IX Complaint was filed with Coordinator Monahan on or about November 8, 2022.

115.    Only one week later, on November 15, 2022, Dr. Walker received notice from Coordinator Monahan that she had denied pursuing Plaintiff's complaint under either Process A or Process B of the Employee Handbook

116.    The decision not to pursue any investigation into Dr. Walker's complaint of discrimination was made without any interview of, or other contact with, Dr. Walker following the submission of his complaint.

117.    At no point between submission of Dr. Walker's complaint and the dismissal of same did Coordinator Monahan contact or otherwise "work with" Dr. Walker as a Title IX Complainant to ensure the complaint was correctly completed, offer supportive measures or advise Dr. Walker of his rights to an advisor under the policy.

118.    In her notice of dismissal, Coordinator Monahan stated that Dr. Walker's complaint was mandatorily dismissed under Process A as the alleged conduct "would not constitute Sexual Harassment" even if proved.

119.    Similarly, Coordinator Monahan stated that no reasonable cause existed to investigate the complaint under Process B because, in her assessment, the alleged conduct "would not constitute Discriminatory Harassment Based on Sex of Discrimination."

120.    Notably, Coordinator Monahan lacked any authority to dismiss Dr. Walker's complaint under Process B. Coordinator Monahan's decision to abuse her power and authority to improperly dismiss Dr. Walker's complaint under Process B deprived Dr. Walker of any semblance of a fair and impartial adjudication of his complaint and belies the University's opinion of Dr. Walker's complaint of discrimination based upon his sexual orientation.

121.    To Plaintiff's knowledge, no other complaints of discrimination had been dismissed outright under Process B, meaning without investigation, for allegedly failing to meet the University's standard for discrimination.

122.    On November 22, 2022, Dr. Walker filed an appeal of the University's decision not to pursue his complaint under either of the available Processes.

123.    Dr. Walker's appeal was referred to an outside investigating entity, Grand River Solutions, Inc. ("Grand River") and thereafter an attorney-investigator, Karen Nutter ("Investigator Nutter") was assigned to the file.

124.    Also, during the pendency of Dr. Walker's appeal, Provost Seigel and Coordinator Monahan submitted a response to Plaintiff's appeal, which Plaintiff only had a limited opportunity to review and reply to.

125.    Also during the pendency of Plaintiff's appeal, Dr. Walker requested that a no-contact order by instituted between himself and Provost Seigel.

126.    In response to the request, Coordinator Monahan demanded that Dr. Walker provide further justification for implementing the order and found that she would not grant Dr. Walker's request

"under these circumstances." There was no further explanation for Coordinator Monahan, yet again, denying Dr. Walker any support during his attempts to address discriminatory behavior against him.

127.    Investigator Nutter explicitly stated that her role was only to evaluate Dr. Walker's appeal under Process A.

128.    Investigator Nutter affirmed the University's decision not to pursue an investigation under Title IX.

129.    In response to the denial of Plaintiff's appeal, Dr. Walker objected to the failure to evaluate his appeal under Process B, and filed an internal appeal to review dismissal of Process B.

130.    Shockingly, it was Coordinator Monahan who decided the appeal of her own determination under Process B. Unsurprisingly, Coordinator Monahan determined to uphold herself and found that there was no basis to warrant a review of her prior reasonable cause determination.

131.    In her appeal decision, Coordinator Monahan, again without any further interview with or information from Plaintiff, determined that Process B would not apply because Provost Seigel's comments strongly inferring that Dr. Walker was likely to sexually abuse Male Student X were somehow not "unwelcome, sexual, sex-based and/or gender-based".

132.    In an effort to have his complaint properly addressed, and based off of the Employee Handbook's assurance that complaints dismissed under Title IX did "not limit the University's authority to address a complaint with an[other] appropriate process and remedies", Dr. Walker contacted the University's Vice President of Human Resources, Scott Esposito ("VP Esposito") to determine what other "process and remedies" were available to address his complaint.

133.    Contrary to the assurances in the Employment Handbook, VP Esposito stated that the only avenue for relief for Dr. Walker was through the Title IX office and, to VP Esposito's assessment, "there is no further recourse available internally for claims of discrimination."

     **c.  Defendant Fairfield Again Stalls Investigation Into, and Resolution Of, Plaintiff's Complaint Under the Employee Handbook**

134.    Following Human Resources' denial of any further recourse for Dr. Walker, Plaintiff believed that he had no further internal option to have his complaint properly addressed.

135.    However, in discussing the situation with colleagues who were well versed in governance processes for faculty and administrative issues, Dr. Walker learned of the existence of another grievance process, available under the Faculty Handbook.

136.    At that time, Defendant Fairfield's Faculty Handbook at Appendix I included due process procedures applicable where 'a faculty member has accused a member of the faculty for … violating his or her professional integrity…"

137.    Where the due process procedures of the Faculty Handbook are triggered, the first step is to engage in an "informal discussion among the [University's] Administration, the individual involved and any interested parties acceptable to both the Administration and the individual."

138.    In the event the complaint is not resolved at the initial informal step, the procedure provided for a formal hearing[4] before a three-person committee wherein the complaining faculty member and Administration would be permitted to, among other things, examine and cross-examine witnesses and present evidence.

139.    Following the formal hearing, the hearing committee was required to maintain a full record of the hearing, promptly and forthrightly adjudicate the issues, and make available any findings and conclusions.

140.    On April 21, 2023, Dr. Walker contacted the University's Academic Council Executive Committee (the "ACEC") which was responsible for faculty governance issues.

---

[4] The following steps apply to tenured faculty.

141.    Dr. Walker cited the Faculty Handbook provisions for due process complaints and noted that an informal process had already taken place with the initial discussions between Plaintiff's attorney and University Counsel, and/or the Title IX provisions of the Employee Handbook. Dr. Walker requested that his complaint proceed directly to a hearing.

142.    In response, the ACEC stated that his legal counsel's initial inquiry with the university and due process procedures of the University's handbooks were separate and distinct. Therefore, the ACEC maintained Dr. Walker's complaint still needed to complete the informal resolution process under the Employee Handbook.

143.    Notably, however, as a first step in that process, the ACEC insisted that Dr. Walker speak directly, meaning face to face, with Provost Seigel, a requirement not found in the process itself.

144.    Dr. Walker had stated that, given the progress of events, he would not feel remotely comfortable in any face to face discussion with Provost Siegel, let alone one  without his attorney present.

145.    However, Dr. Walker agreed to engage in an informal meeting with an administrator about his complaint, as provided for in the Faculty Handbook, and was instructed to communicate this request to JoAnne Williams, Senior Vice President, Finance and Administration ("Vice President Williams").

146.    On July 24, 2023, Plaintiff sent an email requesting a meeting with Vice President Williams.

147.    On August 18, 2023, rather than agree to follow the policy in the Faculty Handbook, Vice President Williams communicated the denial of Plaintiff's request to meet informally with an administrator.

148.    Vice President Williams claimed that the due process procedures did not apply, and directed Dr. Walker to engage the University's legal counsel should Plaintiff wish to pursue his complaint of discrimination further.

149.    As of the date of this filing, the University has failed to take any substantive steps to address Dr. Walker's pending complaint of discrimination against Provost Seigel, opting instead to deny any wrongdoing and allow Dr. Walker's complaint to be buried.

## VII.    Defendant Fairfield Permits a Female Student to Travel for Research Purposes with Dr. Walker

150.    In or around August of 2023, while Dr. Walker, on his own accord and by and through his counsel, continued his efforts to have his discrimination complaint fairly and properly heard by the University, Dr. Walker again scheduled and asked permission to take a trip to Vina Del Mar, Chile, with his research assistant, a female University student, "Female Student Y", to attend the 13th Annual Penguin conference to present their research together in September of 2023.

151.    Female Student Y was approved by Fairfield University's Global Fairfield Program without incident, to accompany Dr. Walker one-on-one on the international trip to Chile.

152.    However, due to Female Student Y contracting COVID-19, she was unable to travel to the conference.

153.    To try to make up for this unfortunate event, and to further advocate for life-changing opportunities for his students, as Dr. Walker was already in South America for work on a recently received prestigious Fulbright Global Scholars Award, he inquired if Female Student Y would be interested in joining him in Argentina in December of 2023 to go "into the field" and collect samples from wild penguins.

154.    This invitation would allow for the opportunity to finally collect the samples from penguins at the locations that Dr. Walker had been unable to visit because of Male Student X's denial of travel in 2021.

155.    Female Student Y was excited for this opportunity, after the disappointment of not being able to travel to Chile in September of 2021.

156.    In November, 2023, Female Student Y applied to Defendant Fairfield's Global Scholars program to travel to Argentina.

157.    As in the approval to travel to Chile for the Penguin Conference, Female Student Y was again approved to engage in international travel with Dr. Walker.

158.    The University was again not similarly concerned with the alleged risk of allowing a student to travel internationally with Dr. Walker when said student was female, the gender for which Dr. Walker holds no sexual attraction.

159.    Defendant Fairfield's choice to permit a female student to accompany Dr. Walker on an international trip, after having fiercely fought to prohibit a male student from traveling abroad, is evidence that Defendant Fairfield's decision to deny Male Student X's application for travel was based on Dr. Walker's sexual orientation and the University's biased belief that such circumstances would naturally pose a safety risk to the male student.

## VIII.    Dr. Walker Suffers Damages as a Result of Defendant Fairfield's Actions and/or Inactions

160.    As a result of Defendant Fairfield's discriminatory actions and/or inactions towards Dr. Walker, Plaintiff has sustained damages.

161.    By way of example, but not limitation, as a result of the University's denial of male Student X's travel to Argentina, Dr. Walker's research suffered in that he was unable to collect and study the second colony of wild penguins.

162.     As a result, Dr. Walker was unable to return to Argentina to complete his research until two years later, thereby causing a delay in the completion of the study as well as publication of the research.

163.     By way of further example, but not limitation, as a result of the discriminatory treatment and biased stigmatization Defendant Fairfield subjected Dr. Walker to, and the University's staunch refusal to acknowledge and rectify same, Plaintiff has suffered tremendous emotional distress having a lasting impact on him both professionally and personally.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
### (Sex/Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964)

164.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

165.     Plaintiff is a man who identifies as homosexual and is therefore a member of a protected class.

166.     Plaintiff was qualified to hold the position he held, and continues to hold, at Defendant Fairfield.

167.     As set forth in detail above and herein, Defendant Fairfield subjected Plaintiff to a hostile work environment on the basis of his sex/gender.

168.     As set forth in detail above and herein, Defendant Fairfield subjected Plaintiff to disparate treatment and disparate discipline on the basis of his sex/gender.

169.     The discrimination that Plaintiff suffered while employed by Defendant Fairfield severely affected the terms and conditions of his employment.

170.    By reason of Defendant Fairfield's repeated violations of Plaintiff's statutory rights, Plaintiff was deprived the equal enjoyment of the terms, conditions, and opportunities of his employment.

171.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

172.    Based on the foregoing, Defendant Fairfield discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Sex/Gender Discrimination in Violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. 46a-60(b)(1))

173.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

174.    Plaintiff is a man who identifies as homosexual and is therefore a member of a protected class.

175.    Plaintiff was qualified to hold the position he held, and continues to hold, at Defendant Fairfield.

176.    As set forth in detail above and herein, Defendant Fairfield subjected Plaintiff to a hostile work environment on the basis of his sex/gender.

177.    As set forth in detail above and herein, Defendant Fairfield subjected Plaintiff to disparate treatment and disparate discipline on the basis of his sex/gender.

178.    The discrimination that Plaintiff suffered while employed by Defendant Fairfield severely affected the terms and conditions of his employment.

179.    By reason of Defendant Fairfield's repeated violations of Plaintiff's statutory rights, Plaintiff was deprived the equal enjoyment of the terms, conditions, and opportunities of his employment.

180.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

181.    Based on the foregoing, Defendant Fairfield discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Sexual Orientation Discrimination in Violation of Title VII of the Civil Rights Act of 1964)

182.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

183.    Plaintiff is a man who identifies as homosexual and is therefore a member of a protected class.

184.    Plaintiff was qualified to hold the position he held, and continues to hold, at Defendant Fairfield.

185.    As set forth in detail above and herein, Defendant Fairfield subjected Plaintiff to a hostile work environment on the basis of his sexual orientation.

186.    As set forth in detail above and herein, Defendant Fairfield subjected Plaintiff to disparate treatment and disparate discipline on the basis of his sexual orientation.

187.    The discrimination that Plaintiff suffered while employed by Defendant Fairfield severely affected the terms and conditions of his employment.

188.    By reason of Defendant Fairfield's repeated violations of Plaintiff's statutory rights, Plaintiff was deprived the equal enjoyment of the terms, conditions, and opportunities of his employment.

189.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

190.     Based on the foregoing, Defendant Fairfield discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Sexual Orientation Discrimination in Violation of Conn. Gen. Stat. 46a-60(b)(1))

191.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

192.     Plaintiff is a man who identifies as homosexual and is therefore a member of a protected class.

193.     Plaintiff was qualified to hold the position he held, and continues to hold, at Defendant Fairfield.

194.     As set forth in detail above and herein, Defendant Fairfield subjected Plaintiff to a hostile work environment on the basis of his sexual orientation.

195.     As set forth in detail above and herein, Defendant Fairfield subjected Plaintiff to disparate treatment and disparate discipline on the basis of his sexual orientation.

196.     The discrimination that Plaintiff suffered while employed by Defendant Fairfield severely affected the terms and conditions of his employment.

197.     By reason of Defendant Fairfield's repeated violations of Plaintiff's statutory rights, Plaintiff was deprived the equal enjoyment of the terms, conditions, and opportunities of his employment.

198.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

199.    Based on the foregoing, Defendant Fairfield discriminated against Plaintiff in violation of Plaintiff's statutory rights, and is therefore liable to Plaintiff in an amount to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Breach of Implied and/or Express Contract)**
**(Breach of Covenant of Good Faith and Fair Dealing)**

200.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

201.    Under Connecticut Common Law, employment manuals, including and especially those containing policies and procedures related to the investigation of employee complaints, constitute sources of enforceable promises and therefore constitute contracts. *See McKibben v. Odd Fellows Healthcare, Inc.*, 2015 WL 6260282 (Conn. Cuper. Ct. Sept. 25, 2015) (*citing Carbone v. Atlantic Richfield Co.*, 204 Conn. 460, 471 (1987)).

202.    As a condition of Plaintiff's employment with Defendant Fairfield, Plaintiff was required to adhere to the terms and conditions of the Employee Handbook and Faculty Handbook.

203.    Throughout his employment, Plaintiff relied upon the understanding, and maintained the reasonable expectation, that Defendant Fairfield would implement and enforce the provisions and policies set forth in its official publications.

204.    Such official publications included, but were not limited to, the Employee Handbook and the Faculty Handbook.

205.    Both the Employee Handbook and the Faculty Handbook contained policies and procedures related to Defendant Fairfield's procedures for investigating and adjudicating faculty complaints.

206.    The Employee Handbook constitutes an express and/or implied contract between Plaintiff and Defendant Fairfield.

207.    The Faculty Handbook constitutes an express and/or implied contract between Plaintiff and Defendant Fairfield.

208.    The contracts contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

209.    At all times relevant, Plaintiff dutifully abided by the terms and conditions of Defendant Fairfield's policies.

210.    In contrast, Defendant Fairfield failed to properly implement and perform its obligations to Plaintiff under the Employee and Faculty Handbooks, causing damage and injury to Plaintiff.

211.    Based on the foregoing, Defendant Fairfield breached its express and/or implied agreement(s) with Plaintiff, and the covenants of good faith and fair dealing contained therein, and is therefore liable to Plaintiff in an amount to be determined at trial.

## JURY DEMAND

212.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on all claims in this action.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff seeks a judgment against Defendant as follows:

(i)     An Order enjoining Defendant, along with its agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of gender/sex and/or sexual orientation;

(ii)    An award of damages against Defendant on Plaintiff's claims, as outlined above, including, without limitation, in reimbursement of and prepayment for all of Plaintiff's expenses including expenses incurred as a consequence of the discrimination he endured; damages for deprivations of the equal access to the employment benefits and opportunities provided by Defendant; and damages for past, present, and future emotional pain and suffering, impairment damages, ongoing and

severe mental anguish, and loss of past, present, and future earnings and enjoyment of life in an amount to be determined at trial;

(iii)    Punitive and/or exemplary damages against Defendant, where available;

(iv)    Statutory pre- and post-judgment interest on all sums awarded, where available;

(v)    An award of costs and attorneys' fees; and

(vi)    Any other relief the Court finds just and proper.

Dated this 14th day of March, 2025.

**Respectfully submitted,**

**NESENOFF & MILTENBERG, LLP**

**By: */S/ Christine D. Brown*    **
**Christine D. Brown, Esq.**
**Andrew Miltenberg, Esq.**
**(*pro hac vice* admission pending)**
**Gabrielle Vinci, Esq.**
**(*pro hac vice* admission pending)**
**Nesenoff & Miltenberg, LLP.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**Tel: 212-736-4500**
**Fax: 212-736-2260**
**Email: cbrown@nmllplaw.com**
**Email: amiltenberg@nmllplaw.com**
**Email: gvinci@nmllplaw.com**

***Attorneys for Plaintiff Dr. Brian G. Walker***